# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
### ORANGEBURG DIVISION

| | |
|---|---|
| Barbara Deloach,  )  | |
|     Plaintiff,  ) | |
| ) | |
| vs.  ) | **COMPLAINT** |
| ) | |
| Walmart Inc.,  ) | (JURY TRIAL DEMANDED) |
|     Defendant,  ) | |
| ) | |

This action is brought under Title I of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101 et seq., to correct the unlawful employment practices of Walmart Inc. and provide appropriate relief to Plaintiff Barbara Deloach.

## JURISDICTION

1. Jurisdiction is proper under 28 U.S.C. § 1331 in that Plaintiff's claims involve federal questions arising under the Americans with Disabilities Act.

## VENUE

2. Venue is proper with this Court pursuant to 28 U.S.C. § 1391(b)(2) because Plaintiff's claims arise out of "events and omissions" that substantially occurred in this Division.

## PARTIES

3. Plaintiff, Barbara Deloach, is a citizen of the State of South Carolina. She resides in Orangeburg, South Carolina.

4. Defendant Walmart Inc. ("Walmart") is a Delaware corporation that operates Walmart Supercenters, Discount Stores, Neighborhood Markets and Sam's Clubs. Walmart currently operates more than 100 retail stores in the State of South Carolina. Walmart's corporate headquarters is located at 702 S.W. 8th St., Bentonville, Arkansas 72716.

5. At all times relevant to this Complaint, Defendant has continuously been an employer engaged in an industry affecting commerce under Section 101(5) of the ADA, 42 U.S.C. § 12111(5), and Section 101(7) of the ADA, 42 U.S.C. § 12111(7).

6. At all times relevant to this Complaint, Defendant has been a covered entity under Section 101(2) of the ADA, 42 U.S.C. § 12111(2).

## FACTS

7. Mrs. Deloach is an individual who is deaf.

8. Mrs. Deloach's primary language is American Sign Language (ASL). She does not speak English, and her use of written English is extremely limited and at a basic level. She can "read lips" to the point of understanding some simple, basic English words.

9. ASL is a language separate and distinct from English and has different grammar.

10. Mrs. Deloach is substantially limited in the major life activities of hearing and communication (both receptive and expressive).

11. At all times relevant to this Complaint, Mrs. Deloach has been a person with an "actual" disability and a "record of" a disability, as defined by the ADA Amendments Act of 2008, 42 U.S.C. § 12102(1)(A) and (B).

12. At all times relevant to the Complaint, Walmart has "regarded as" Ms. Deloach as having a disability, as defined by the ADA Amendments Act of 2008, 42 U.S.C. § 12102(1)(C).

13. In the fall of 2019, Mrs. Deloach completed an on-line application for a position at the Walmart Supercenter (Store no. 616) located at 2795 North Rd., Orangeburg, S.C. 29118.

14. Walmart had been aware of Mrs. Deloach's deafness and communication limitations since the time of her application on which she disclosed she was deaf.

15. Upon receiving Mrs. Deloach's application, Walmart knew she was an individual with a disability within the meaning of the ADA.

16. When Mrs. Deloach did not get a response to her application, she went to the store in person and met a manager named Sonia. Sonia knew that Mrs. Deloach was deaf. Sonia told her to come back the next day for an interview.

17. The following day, Mrs. Deloach returned to the store and interviewed with a manager named Josh. There was no interpreter.

18. Mrs. Deloach uses a Video Relay Service (VRS) on her video phone for making and receiving phone calls with people in other locations, with remote interpretation by an ASL interpreter VRS is a free service.

19. Video Remote Interpreting (VRI) is a service that facilitates communication, in the form of video conferencing, between deaf persons and hearing persons in the same location, with remote interpretation by an ASL interpreter. VRI service can be purchased from various communication service providers.

20. VRI services can be purchased by employers to communicate with deaf employees at work – using a computer with a webcam, tablet or video phone and a high-speed internet data connection.

21. Walmart did not subscribe to any VRI service at the time manager Josh met with Mrs. Deloach, nor were any arrangements made to have a live, on-site ASL interpreter.

22. Josh spoke to Mrs. Deloach, but she was not able to understand him without an interpreter.

23. Josh showed Mrs. Deloach around the store while speaking and motioning to her. He tried to show her things by pointing. Mrs. Deloach indicated it was difficult for her to understand what he was saying. Josh said, "I am sorry, I don't understand sign language" and just kept going. He gave her a blank piece of paper so they could write back and forth, but this was ineffective. The interview began at 9 am and ended at 12 pm. Various other Walmart employees spoke to Mrs. Deloach as well, but she was unable to understand them.

24. Walmart hired Mrs. Deloach on October 10, 2019, in an Associate position as a Stocker.

25. A Stocker scans items and puts them in appropriate places or zones in the store.

26. Mrs. Deloach was able to fulfill the essential functions of her job with reasonable accommodation: She needed an interpreter from time to time to communicate with managers about the terms, conditions and privileges of employment.

27. During her first month, Walmart showed Mrs. Deloach training videos, including one on the duties of a Stocker.

28. There were no written captions or on-screen ASL interpreters in the training videos.

29. Mrs. Deloach asked Josh for captions, but he replied that he did not know how to do that.

30. Mrs. Deloach discovered how to turn on captions only by the time she got to the final video; so she only had the benefit of captions for that last video.

31. Because the training video captions were in English, they were confusing and of limited help. Walmart did not offer Mrs. Deloach training videos with an on-screen ASL interpreter.

32. At no point during Mrs. Deloach's orientation did Walmart offer her an ASL interpreter.

33. Walmart has a system called "The Wire," which gives associates on-line access to Walmart's written policies and procedures.

34. Walmart did not make Mrs. Deloach aware of The Wire or provide her with access to information on its policies and procedures through an interpreter.

35. Mrs. Deloach's orientation did not include or convey to her any information on policies and procedures in a way she could have understood.

36. Walmart never made Mrs. Deloach aware of any resources for deaf employees.

37. Walmart never made Mrs. Deloach aware of how to make a formal request for a reasonable accommodation for a disability.

38. Mrs. Deloach told her manager "Josh" about a phone number he could call to communicate with her on her video phone through a VRS (Video Relay Service). The VRS would enable them to them communicate from different locations through a remote ASL interpreter.

39. But neither Josh nor any of her other managers ever used VRS to communicate with Mrs. Deloach from any location.

40. Not once did Walmart utilize any VRS service, or purchase a VRI service, or provide a live, on-site ASL interpreter or give Mrs. Deloach any other accommodation for her disability.

41. Instead, Walmart's managers and staff would point with their hands and write notes on pieces of paper.

42. When Mrs. Deloach indicated to her managers that she did not understand written notes, they would just continue to talk.

43. In February 2020, Mrs. Deloach got the flu and missed a week of work.

44. She called into Walmart's Associate Information Line to report her absence.

45. At the time, Walmart had not informed her about Sedgwick.

46. Sedgwick is Walmart's third-party leave administrator and agent for accommodations.

47. Mrs. Deloach gave Walmart her release to return-to-work release on February 5, 2020.

48. In February 2020, Walmart learned that Mrs. Deloach had fallen in the store while working and injured her back.

49. She had been backing up with her cart and did not see there was something lying on the floor, which caused her to trip and fall.

50. Mrs. Deloach went to the office to let manager Lissa know what had happened. She repeatedly asked for an interpreter, but Lissa replied, "No . . . on paper." Lissa was adamant that they would use written notes. It was hard for Mrs. Deloach to explain on paper what had happened to her. She wanted to show Lissa where she had fallen, but

Lissa insisted, "No, on paper, on paper." Lissa refused Ms. Deloach's request for an interpreter.

51. Mrs. Deloach asked if she should go to the Emergency Room. Lissa told her to just go to see a nurse.

52. They wrote back and forth, which was confusing, and Mrs. Deloach could not understand.

53. As a result of the lack of understandable direction from Lissa or others, Mrs. Deloach was not able to seek or obtain workers' compensation benefits from Walmart.

54. She had to pay for her medical treatment out of her own pocket.

55. Mrs. Deloach missed three days of work for her back pain.

56. She called in her absences to the Walmart Associate Information Line.

57. Manager Lissa knew Mrs. Deloach was at home because of her back injury.

58. Lissa gave Mrs. Deloach a "PTO card." Mrs. Deloach asked what it was, but Lissa would not explain. Mrs. Deloach asked team members who explained the card was for "Paid Time Off" and that she needed to fill out paperwork to document her PTO or Walmart would deduct her days absent from her pay.

59. Mrs. Deloach was confused and struggled to understand -- no one had explained this to her before, and Walmart did not provide an interpreter.

60. After her fall, Mrs. Deloach's co-workers began harassing her.

61. Mrs. Deloach had a cart she used for stocking.

62. While Mrs. Deloach was not looking, other Associates (who were her team members) would add boxes of items, that they were supposed to stock, onto Mrs. Deloach's cart, so she would have do their work for them. They came up behind her and she could not hear them; but she was suspicious. So she began counting her boxes and found that the number of boxes would increase instead of decreasing as she stocked. She could never finish her cart and became very frustrated by the abuse.

63. Often, Stockers would come up behind Mrs. Deloach's her back (because she could not hear) and put an item for stocking in a different area, into her cart, purposefully making her job harder. They would also put empty boxes of their own in Mrs. Deloach's cart or work area, which she then had to discard.

64. Other Stockers would falsely tell Mrs. Deloach that her supervisor needed to see her. She would go to the office only to learn she had not, in fact, been summoned.

65. Mrs. Deloach told her managers about the harassment, but the harassment continued.

66. Team members also blamed Mrs. Deloach for things they, themselves, had done wrong.

67. At one point, manager Samuel coached Mrs. Deloach for something that another team member had done.

68. Later, Samuel figured out it was not Mrs. Deloach's fault; and the next day he apologized, indicating, "You have been working hard, we know you have been working hard. Thank you."

69. Mrs. Deloach's managers continued to attempt to communicate with her by writing notes on pieces of paper.

70. She would respond, "I don't understand. Need interpreter." She made this request in writing multiple times.

71. Walmart knew or should have known Mrs. Deloach's request was for an ADA reasonable accommodation from a qualified individual with a disability.

72. Walmart knew or should have known it had an obligation to engage in a good faith interactive process with Mrs. Deloach in order to find an accommodation that was not an undue hardship on the operation of Walmart's business.

73. However, Walmart never engaged in an interactive process with Mrs. Deloach.

74. Walmart violated its own reasonable accommodation policy by not beginning an interactive process.

75. Walmart continued to refuse Mrs. Deloach's repeated requests for an interpreter.

76. When it became obvious that Walmart would never provide an interpreter, Mrs. Deloach gave up asking.

77. Mrs. Deloach began to use a different technique to indicate she was confused by what her supervisors would write to her.

78. Mrs. Deloach would shrug her shoulders or make a facial expression conveying confusion and point with her hand to words she did not understand or found confusing.

79. Facial expressions conveying confusion and pointing out written words that are not understood can be a communication technique used by deaf individuals.

80. Mrs. Deloach's supervisors learned to understand she was communicating her confusion.

81. Her supervisors knew she was deaf. The need for accommodation was obvious.

82. Walmart knew or should have known Mrs. Deloach needed an ADA accommodation.

83. However, Walmart still did not initiate an interactive process or attempt to accommodate her with an interpreter or otherwise.

84. In April 2021, Mrs. Deloach came down with gastritis.

85. She told manager Samuel that she did not feel well.

86. He indicated she should go home and that he would tell Angel in HR. Mrs. Deloach missed two days of work.

87. She called in her absences to the Associate Information Line.

88. In April 2021, Mrs. Deloach learned she needed a tooth extraction.

89. She told managers Cynthia and Martinez, and they both replied. "OK."

90. She called in to the Associate Information Line. They told her to call Sedgwick.

91. They tried to explain that Sedgwick would help with the surgery, but Mrs. Deloach was confused.

92. Mrs. Deloach had to Google Sedgwick because this was the first time she had ever heard of it.

93. She then called Sedgwick and changed her schedule so she could go to a dentist in Charleston whose services she believed were supposed to be covered by insurance that she believed Walmart provided to her.

94. Managers Cynthia and Martinez knew Mrs. Deloach was deaf; her need for accommodation was obvious.

95. Walmart knew or should have known this was yet another request for an ADA accommodation.

96. However, Walmart did not then initiate an interactive process or attempt to accommodate Mrs. Deloach with an interpreter, or otherwise, in order to help her understand this conversation about leave, benefits and Walmart's policy and procedure.

97. When she visited the dentist, she was asked if she had dental insurance. Mrs. Deloach was not sure.

98. So, after her appointment at the dentist, she asked her manager Cynthia about dental insurance.

99. Cynthia directed Mrs. Deloach to ask Angel in HR.

100. Mrs. Deloach went to see Angel. Angel wrote: "Ask your coach Cynthia."

101. This was confusing as Cynthia had directed Mrs. Deloach to ask Angel.

102. Mrs. Deloach continued to try to communicate with Angel to find out if she had dental benefits from Walmart.

103. She could not understand what Angel was writing to her. Angel used words that Mrs. Deloach did not understand.

104. Mrs. Deloach shrugged her shoulders and shook her head to communicate she was confused, while pointing to the words she did not understand. She wrote down, "Sorry What you said again?"

105. Angel knew Mrs. Deloach was deaf; her need for accommodation was obvious.

106. Walmart knew or should have known this was yet another request for an ADA accommodation.

107. However, Walmart did not then initiate an interactive process or attempt to accommodate Mrs. Deloach with an interpreter, or otherwise, so that she could understand this conversation about leave, benefits, and Walmart policy and procedure.

108. It appeared to Mrs. Deloach that Angel was telling her she did not have dental benefits through Walmart, because she had not signed up for those when she was hired. Angel told Mrs. Deloach to wait until next year to sign up for benefits.

109. Mrs. Deloach wrote to Angel, asking why she had not told her this before.

110. Angel replied, "We told you that before."

111. Mrs. Deloach explained to Angel that she did not have an interpreter during orientation and did not understand that she needed to sign up for dental insurance in order to have that benefit.

112. At this time, also, Walmart knew or should have known Mrs. Deloach was asking for an accommodation for her disability.

113. Ultimately, Mrs. Deloach came to understand she did not have any benefits. No dental insurance; no health insurance.

114. Mrs. Deloach asked Angel to put in for PTO for her absences. Angel replied: "I will" but never did.

115. On information and belief, Walmart has open enrollment for benefits every October.

116. Mrs. Deloach did not sign up for benefits during open enrollment in October 2019 when she was hired, nor in October 2020, because she was not aware of the benefits Walmart offered or an opportunity to sign up.

117. At her 2019 October orientation, when benefit information should have been provided, there was no ASL interpreter.

118. Had benefits been addressed, Mrs. Deloach would not have understood without accommodations.

119. By the time Mrs. Deloach discovered she had not been offered an opportunity to enroll in health insurance benefits at Walmart, she had missed the open enrollment window.

120. Team Coach "Samuel" told Mrs. Deloach that Walmart should reimburse her for the dental surgery; but she had to pay out-of-pocket.

121. Mrs. Deloach had to miss work for dental surgery. She called the absences in to the Associate Information Line, as she had done previously.

122. The dentist gave her a doctor's note excusing her from two days of work to recovery from the surgery.

123. He told her that if she still was not feeling well, she should stay home longer.

124. Mrs. Deloach tried to give the doctor's note to manager Lissa, but Lissa would not take the note and indicated, "We don't need that."

125. There was a policy in the store that managers would not accept doctor's notes from associates.

126. Mrs. Deloach was still in a lot of pain after two days, so she took almost a full week off.

127. She called Team Coach Samuel every day, as well as Sedgwick, to report her absences.

128. Mrs. Deloach was given a different approval or confirmation number each time she called in.

129. When Mrs. Deloach arrived for her shift on September 6, 2021, everyone was acting strangely towards her.

130. The next day, September 7th, she was scheduled to work until 11:00 pm, but at 6:00 pm manager Cynthia called Mrs. Deloach into the office. Manager Nate was in the office as well.

131. They gave Mrs. Deloach a piece of paper that said, "We know that your job is hard, you've missed too much work. Please give us your badge and vest, you are finished."

132. They took the piece of paper back from Mrs. Deloach and kept it.

133. Mrs. Deloach was heartbroken and confused. She took off her badge and vest and handed them in.

134. She asked why she was fired.

135. They said it was because she missed too much work and did not call in her absences.

136. This was not true: Mrs. Deloach had called in every absence.

137. She told them that she had called in her absences. She told them that she had confirmation numbers. She showed them her Walmart Identification Card and told them to check the computer.

138. They looked at the computer and talked among themselves but did not explain or tell her what they had found on the computer.

139. Mrs. Deloach peered at the computer, and it appear that indeed her phone calls were logged with her WIN number, and the date and time of her calls.

140. Ms. Deloach waited for a time, but the managers ignored her continued presence in the office. So, she began to leave.

141. As she was leaving, manager Cynthia tapped her on the shoulder and mouthed to her, "I am so sorry, this is not me." Mrs. Deloach shrugged and then left.

142. Her managers knew Mrs. Deloach was deaf; her need for accommodation was obvious at this termination.

143. Yet no interpreter was present, and no other accommodation was provided.

144. At the time of the termination, Walmart knew or should have known that Mrs. Deloach was conveying her lack of understanding and her need for an interpreter or other reasonable accommodation.

145. Yet Walmart still did not engage in an interactive process.

146. Walmart has a progressive discipline policy.

147. Under Walmart's progressive discipline policy, associates are not subject to termination until they have a certain number of write-ups.

148. Mrs. Deloach did not have any disciplinary or performance write-ups prior to her termination.

149. Walmart terminated Mrs. Deloach less than a month before she would have been eligible to sign up for benefits during open enrollment in October 2021.

150. Walmart's failure to reasonably accommodate Mrs. Deloach was the proximate cause of her not enjoying the health insurance benefits, for which she was entitled to enroll, as well as for her termination.

151. Mrs. Deloach did not complain or appeal to Open Door because Walmart never made her aware of this grievance procedure or of The Wire, Walmart's on-line portal for its Policies and Procedures.

FOR A FIRST CAUSE OF ACTION
(Violation of Title I of the ADA -- Failure to Accommodate)

152. The foregoing allegations are repeated and re-alleged here.

153. The ADA prohibits discrimination by an employer against a qualified individual with a disability in the terms, conditions and privileges of employment. 42 U.S.C. § 12112(a); 29 C.F.R. § 1630.4.

154. The ADA defines discrimination as, among other things, not making reasonable accommodations to an otherwise qualified individual with a disability. 42 U.S.C. § 12112(b)(5)(A); 29 C.F.R. § 1630.9.

155. Reasonable accommodations may include modifications or adjustments to the work environment or to how the job position is performed that enable a qualified individual with a disability to perform the essential functions of the job. 42 U.S.C. § 12111(9)(B); 29 C.F.R. § 1630.2(o)(1)(ii).

156. Reasonable accommodations may include modifications or adjustments that enable an employee with a disability to enjoy benefits and privileges of employment equal to those enjoyed by similarly-situated employees without disabilities. 42 U.S.C. § 12111(9)(B); 29 C.F.R. § 1630.2(o)(1)(iii).

157. Examples of reasonable accommodations include ASL interpreters, equipment and devices such as VRI service, modification of training materials to include closed-captions and on-screen ASL interpreters, and modification of policies. See 42 U.S.C. § 12111(9)(B); 29 C.F.R. § 1630.2(o)(2)(ii).

158. Mrs. Deloach was a qualified individual with a disability within the meaning of the ADA.

159. Mrs. Deloach could perform the essential functions of her job with the use of reasonable accommodations including interpreters, VRI service, and accessible training materials.

160. Mrs. Deloach was entitled to enjoyment of the terms, conditions and privileges of her employment at Walmart, including the training necessary to perform her job; access to disability accommodation; enrollment in Walmart's health insurance; dental insurance and other benefit plans available to employees without disabilities; worker's compensation benefits; and an environment free of harassment.

161. Under the ADA, once an employee requests an accommodation, or when the employee's disability and need for accommodation is obvious, the employer must engage in an interactive process with the employee to identify the precise limitation resulting from the disability and identify reasonable accommodations that overcome those limitations. 29 C.F.R. § 1630.2(o)(3).

162. Walmart's own policy on reasonable accommodations expresses these protections required by the ADA; but Walmart did not adhere to its policy in this case, neither at the time of Mrs. Deloach's interview or thereafter.

163. Walmart knew that providing an interpreter for a deaf employee for important employment conversations involving the terms and conditions of employment was a reasonable accommodation, but it made no effort to provide this accommodation.

164. Walmart discriminated against Mrs. Deloach when it failed to engage in an interactive process and denied her reasonable accommodation for her disability.

165. The above-described unlawful employment practices caused Mrs. Deloach to lose wages and access to benefits of employment including the value of health and dental insurance; and she has suffered emotional distress, inconvenience and other pecuniary and nonpecuniary loses.

166. Walmart committed these unlawful acts intentionally and with reckless indifference to Mrs. Deloach's legal rights.

## FOR A SECOND CAUSE OF ACTION
(Harassment and Hostile Work Environment)

167. The foregoing allegations are repeated and re-alleged here.

168. A hostile work environment results from, among other things, unwelcome conduct of supervisors and co-workers with whom an employee interacts on the job, and when the unwelcome conduct or harassment renders the workplace atmosphere intimidating, hostile or offensive.

169. The offensive conduct of Mrs. Deloach's team members who harassed her and made her job more difficult, all as described above, and management's failure to correct their conduct, created a hostile environment in which Mrs. Deloach was singled out for harassment, ridicule and intimidation.

170. The results of Walmart's failure to ensure Mrs. Deloach understood significant aspects of orientation, including discussion of training and employee benefits, along with its failure to advise Mrs. Deloach about Policies and Practices, including those governing procedure for seeking worker's compensation for workplace injury and for notifying of

illness and absences, along with co-worker harassment that targeted and exploited her disability, created a hostile workplace atmosphere where Mrs. Deloach was deprived of privileges afforded non-disabled employees.

171. The above-described unlawful harassment and hostile work environment caused Mrs. Deloach to lose wages and access to benefits of employment including the value of health and dental insurance; and she has suffered emotional distress, inconvenience and other pecuniary and nonpecuniary loses.

172. Walmart committed these unlawful acts intentionally and with reckless indifference to Mrs. Deloach's legal rights.

### FOR A THIRD CAUSE OF ACTION
(Wrongful Termination/Disability Discrimination)

173. The foregoing allegations are repeated and re-alleged here.

174. At all times relevant to the allegations of this Complaint, Mrs. Deloach was fulfilling Walmart's expectations in performing her job.

175. Walmart terminated Mrs. Deloach suddenly, without prior notice or discipline, for the ostensible reason that she had not called in or properly reported her absences from work following dental surgery.

176. However, as alleged above, Mrs. Deloach had never been trained on or informed of procedures for calling in or reporting absences in a way she could have understood.

177. As she had done after her workplace injury, Mrs. Deloach used the Associates Information Line and one-on-one interaction with her managers to report her absences due to injury and surgery.

178. At no time was Mrs. Deloach instructed that use of the Associates Information Line to report absences was insufficient. Nor was she advised of The Wire as a means to learn of policy and procedures or of Open Door grievance procedures.

179. The reason Walmart gave for Mrs. Deloach's termination on September 7, 2021, that is, not properly reporting her absences, was pretext for discrimination.

180. Termination for this reason without prior discipline did not conform to Walmart's progressive discipline policy, evidencing discrimination and pretext.

181. In any event, termination for this reason would have been a disproportionate reaction to such a minor violation of attendance reporting policy, also evidencing pretext.

182. Mrs. Deloach believes that one or more of her managers may have deleted from the attendance record the confirmation numbers she had received when she reported her absences on the Associates Information Line and deleted, as well, the notations that her absences had been excused.

183. Mrs. Deloach was terminated within only three weeks of being finally eligible to enroll in health and dental insurance, and other employee benefits, in October 2021.

184. The close proximity in time between the termination and eligibility for open-enrollment for benefits is affirmative evidence of disability discrimination and that the reason given for Mrs. DeLoach's termination was pretextual and not worthy of credence.

185. The above-described discrimination caused Mrs. Deloach to lose wages and access to benefits of employment including the value of health and dental insurance; and she has suffered emotional distress, inconvenience and other pecuniary and nonpecuniary loses.

186. Walmart committed these unlawful acts intentionally and with reckless indifference to Mrs. Deloach's legal rights.

## FOR A FOURTH CAUSE OF ACTION
(Retaliation)

187. The foregoing allegations are repeated and re-alleged here.

188. The ADA prohibits retaliation against, and interference with, an employee's exercise of activity that is protected by the ADA. 42 U.S.C. § 12203(a) and (b).

189. Walmart had found it inconvenient to accommodate Mrs. Deloach's disability and sought to deny her an opportunity to enroll in employee benefits. It determined to find a way to get rid of her.

190. By requesting reasonable accommodations for her disability, throughout her employment with Walmart, Mrs. Deloach engaged in activity protected by the ADA.

191. Walmart retaliated against Mrs. Deloach for engaging in the protected activity of seeking reasonable accommodations by terminating her.

192. By requesting health and dental insurance and other benefits available to other employees, as soon as she was made aware of those benefits, Mrs. Deloach engaged in activity protected by the ADA.

193. Walmart interfered with Mrs. Deloach's pursuit of health, dental and other benefits for which others were eligible by terminating her.

194. The above-described retaliation and interference caused Mrs. Deloach to lose wages and access to benefits of employment including the value of health and dental insurance; and she has suffered emotional distress, inconvenience and other pecuniary and nonpecuniary loses.

195. Walmart committed these unlawful acts intentionally and with reckless indifference to Mrs. Deloach's legal rights.

## PRAYER FOR RELIEF

Wherefore, Plaintiff Mrs. Deloach requests that Defendant Walmart be found liable for the above-alleged violations of law and that this Court grant her the following relief:

    a.    Injunctive relief;

    b.    Back pay;

    c.    Reinstatement and/or front pay as appropriate;

      d.      Compensatory damages;

      e.      Consequential damages;

      f.      Punitive damages;

      g.      Pre- and post-judgment interest;

      h.      Costs, litigation expenses, expert witness fees and reasonable attorney's fees, and

      i.      Any further relief this Court deems just and proper.

<u>A JURY TRIAL IS DEMANDED</u>.

Dated: Charleston, SC

April 19, 2023

Respectfully submitted,

*s/David A. Nauheim*
David A. Nauheim
Federal Court ID No. 12551
NAUHEIM LAW OFFICE, LLC
P.O. Box 31458
Charleston, SC 29417
Tel: 843 534-5084
Fax: 843 350-3572
*david@nauheimlaw.com*

*s/Rebecca Guental Fulmer*
Rebecca Guental Fulmer
Federal Court ID No. 5160
DISABILITY RIGHTS SOUTH CAROLINA
3710 Landmark Dr., Suite 208
Columbia, South Carolina 29204
Tel: (803) 782-0639
Fax: (803) 753-9743
fulmer@disabilityrightssc.org

*Attorneys for the Plaintiff*